# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION



FILED

96 MAY 17 AM 10: 16

N.D. OF ALABAMA

WALTER OWENS, CLAY ) 
ALBRIGHT, BOBBY LEWIS, ) 
JILL MCCULLARS, on behalf of ) 
themselves and others similarly situated, ) 
                                          ) 
        Plaintiffs, ) 
                                            ) 
v.                                           )     CV 96 C 0440 KLE 
                                            ) 
MONSANTO COMPANY, ) 
                                            ) 
        Defendant. )     **JURY TRIAL DEMANDED**

## SECOND AMENDED COMPLAINT

COMES NOW the plaintiff, Walter Owens, and pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, hereby amends his complaint to state as follows:

### PARTIES AND JURISDICTION

1.     Defendant Monsanto Company ("Monsanto"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri. Monsanto manufactures and sells chemicals and agricultural products and is registered and authorized to do business in Alabama. Monsanto owns and operates a chemical plant in Anniston, Alabama where PCBs were manufactured for over forty years.

2.     Named Plaintiff Walter Owens is an individual citizen of Alabama who resides in Centreville, Bibb County, Alabama and owns a lakehouse on Lake Mitchell on the Coosa River below the Anniston chemical plant.

3.     Additional Named Plaintiff Clay Albright is an individual citizen of Alabama who resides in Tuscaloosa, Tuscaloosa County, Alabama and owns a lakehouse on Lay Lake on the Coosa River below the Anniston chemical plant.

4.     Additional Named Plaintiff Jill McCullars is an individual citizen of Alabama who owned a house on Choccolocco Creek leading into Lake Logan Martin on the Coosa River below the Anniston chemical plant.

5.     Additional Named Plaintiff Bobby Lewis is an individual citizen of Alabama who resides in Anniston, Calhoun County, Alabama and controls an interest in land in Anniston located along a drainage ditch near the Anniston chemical plant where high levels of PCBs have been found.

6.     Additional Named Plaintiff Tony J. Montalbano is an individual citizen of Alabama who resides in Jefferson County, Alabama and owns a lakehouse on Logan Martin Lake on the Coosa River below the Anniston chemical plant.

7.     The Named Plaintiffs bring this action on their own behalf and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all members of the Class of property owners, lessees and licensees since 1993 of properties located around the Monsanto plant in Anniston, on the tributaries and ditches leading from the plant, and on the Coosa River below the plant, including properties located on Lake Logan Martin, Lay Lake, and Lake Mitchell.

8.     The term "Plaintiffs" as used herein refers collectively to both the Named Plaintiffs and the plaintiff class, and the term "Class" includes the individual Plaintiffs.

9.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exceeds fifty thousand dollars ($50,000.00),

exclusive of interest and costs. Each Named Plaintiff and each member of the Plaintiff Class seek damages in excess of $50,000.000, exclusive of interest and costs.

## SUBSTANTIVE AVERMENTS

10.     This action concerns Monsanto's pollution of Alabama waterways and land with a toxic substance known as polychlorinated biphenyls or "PCBs."

11.     PCBs are carcinogenic materials which were manufactured by Monsanto for use as insulation in electrical transformers and other commercial purposes such as pesticides, hydraulic fluid, paint, newsprint and coils in deep fat fryers. PCBs were favored by the electrical industry because they were non-flammable and could conduct heat without conducting electricity.

12.     Monsanto was the sole United States manufacturer of PCBs. All PCBs manufactured by Monsanto in this country were manufactured at two plants, one of which was located at Anniston, Alabama near Lake Logan Martin and the other in Sauget, Illinois.

13.     At all times, Monsanto had superior knowledge concerning PCBs and the manufacture and disposal of PCBs.

14.     PCBs are hazardous to humans and the environment. PCBs remain toxic and do not readily break down in the environment. As set out in more detail below, numerous tests and empirical evidence show that PCBs cause cancer, liver disease, skin conditions and other maladies in humans, as well as disease and death of several species of wildlife (some to the point of extinction).

15.     Because of the longevity of PCBs and their hazardous effects on humans and the environment, the United States government officially banned production of PCBs in the 1970s.

## Monsanto's Production And Improper Disposal Of PCBs

16.     Monsanto manufactured PCBs from the 1930s until the mid 1970s. The production of PCBs by Monsanto was "highly profitable" for the company.

17.     The manufacture of PCBs was a dry process which did not require the use of water from public water systems, sewers or natural sources of water.

18.     During the more than 40 years that PCBs were produced at the Anniston plant, Monsanto routinely and intentionally, or otherwise recklessly, disposed of the PCBs and related toxic substances in a manner which endangered, and continues to endanger, life and the environment.

19.     Specifically, Monsanto routinely dumped excess PCBs and acid containing PCBs into the plant's sewer system, which leads directly into ditches around the plant, which drain into tributaries leading to Lake Logan Martin on the Coosa River.

20.     Additionally Monsanto routinely dumped PCBs and PCB-contaminated substances into crude landfills located on its property in Anniston.

21.     As a result of Monsanto's improper and reckless disposal of PCBs, PCBs were discharged into the soil and waterways surrounding the plant, including the creeks and ditches which led from the plant to Snow Creek then into Choccolocco Creek which leads into Lake Logan Martin on the Coosa River. This improper disposal took place for years without any corrective action being taken and has resulted in the contamination of the land and waters. As shown below, this contamination of the environment continues today.

## Monsanto's Knowledge Of The Hazards Of PCBs

22.     Monsanto at all times relevant hereto knew of the hazards of PCBs but, because of the profitability of the enterprise, continued to manufacture and improperly dispose of them at its Anniston plant.

23.     From the very beginning, Monsanto recognized that PCBs were hazardous materials. As early as the 1930s, Monsanto was aware that PCBs caused skin and liver disorders. In the 1940s, scientists found that PCBs were linked to serious liver disorders in workers in wire and cable mills where PCBs were handled.

24.     In the 1950s, reports showed that prolonged exposure to PCBs caused liver problems. By 1955, Monsanto wrote that "We know [PCBs] are toxic but the actual limit has not been precisely defined." (Ex. A). In fact, Monsanto specifically prohibited its workers from eating lunches in the manufacturing areas of the chemical plant due to the dangers of PCBs. Thereafter, Monsanto, the U.S. government and others conducted numerous tests related to PCBs which confirmed the toxicity and dangers of PCBs.

25.     Monsanto learned in 1968 that 1300 people in Japan had become ill after eating PCB-contaminated rice oil. It learned in 1970 that cows in Ohio ingesting grain from silos painted with paints containing PCBs produced PCB-contaminated milk. By the same time, it had received reports that PCBs in humans caused cancer, liver damage and problems with the reproductive process.

26.     In 1969, Monsanto concluded that "there is little probability that any action that can be taken will prevent the growing incrimination of specific [PCBs] as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds."

27. A 1974 report by the Center for Disease Control sent to Monsanto wrote that " a tremendous quantity of research has demonstrated that environmental exposure to [PCBs] causes serious impairment of the functions of the liver." (Ex. B).

28. A 1975 report by the Environmental Protection Agency sent to Monsanto confirmed that PCBs "pose a threat to human health and the environment." (Ex. C).

29. Monsanto knew PCBs were hazardous but manufactured and profited from them for over 40 years with conscious disregard for the rights of others.

Monsanto's Knowledge That It Was Polluting The Waters

30. At all times relevant hereto, Monsanto knew that the method of disposing of PCBs at its Anniston plant was uncontrolled and improper and knew that this was causing pollution of the land around its plant and the waters below the plant.

31. In internal memoranda, Monsanto officials acknowledge that "the waters in receiving streams below the Anniston Plant contain significant (parts per million) concentrations of PCBs. More ominous perhaps is the fact that sediment in the bottom of these streams miles below our plants may contain up to 2% [PCBs]." (Ex. D, p. 8). Monsanto officials warned that "The Dept. Of Interior and/or State authorities could monitor plant outfall and find ppm of [PCBs] at Anniston anytime they choose to do so. This would shut us down depending on what plants or animals they choose to find harmed." (Ex. E).

32. In a letter dated 10/12/70, Monsanto, addressing the "(PCB) environmental pollution problem" wrote that Monsanto can "no longer dump scrap [PCBs] or spent transformer [PCBs] down the sewer. Indiscriminate dumping of such material can lead to serious repercussions for the electrical industry." (Ex. F).

33.    In another memo, Monsanto acknowledged that it has become "increasingly obvious that high levels [of PCBs] would continue because of the PCB's trapped in the soil and in the sewer systems. Clean-up of these sources can be economically impractical. . . . It appears that the PCB contamination is so widespread that all of the plant's effluent must be treated. This would result in a system more complex and costly than anyone had anticipated . . . ." (Ex. G).

34.    Testing of Choccolocco Creek and the waters in Lake Logan Martin by an independent lab hired by Monsanto showed no decrease in the amount of PCBs in the water and found a large number of "deformed fishes" in waters below the plant and a great number of "fishes that are either sick or listless in these areas" evidencing that "something is indeed wrong in these areas." (Ex. H). A September 1970 memo noted that statistics showed the discharge of PCBs into the water and complained that these figures "could be subpoenaed and used against us in legal actions. Obviously, having to report these gross losses multiplies, enormously, our problems because the figures would appear to indicate lack of control." (Ex. I).

35.    Monsanto was keenly aware of the long lasting effects of PCBs, finding that "We can't defend [against] everything. Some animals or fish or insects will be harmed. [PCB] degradation rate will be slow. Tough to defend against." (Ex. E, p. 1). The same memo acknowledged that PCBs settled in river bottoms and "apparently has a long life" and further described problems in other areas where PCBs had been found to kill baby shrimp in Pensacola and birds in San Francisco. (Id., p. 2).

36.    Monsanto was also aware of the adverse publicity that would happen if the facts were ever discovered by the Public: "If this PCB issue hits the Alabama press, the Alabama Water Improvement Commission would be forced to close Choccolocco Creek and the Martin-Logan reservoir to commercial and sport fishing unless we can prove that the contamination level does not

reach the reservoir." (Ex. J). As shown below, Monsanto's predictions ultimately came true as the Creek was closed due to PCB contamination.

37.    Despite its knowledge, Monsanto continued to manufacture PCBs and failed to warn the Public and Plaintiffs of the dangers of PCBs which had polluted the waters below the Anniston chemical plant. Further, Monsanto did not attempt to clean up the environmental pollution it had caused and instead attempted to continue the production of PCBs.

Monsanto's Efforts To Conceal The Existence And Hazards Of PCBs

38.    With full knowledge of the hazards of PCBs and the pollution of the soil and waters around and below Anniston, Monsanto made the conscious decision to suppress and conceal these facts from the Public and Plaintiffs in order to maintain sales and to avoid liability, publicity, and other adverse consequences of its actions. Most egregiously, instead of attempting to warn the public and to clean up the environment, Monsanto set out to sell even more PCBs. At all times, Monsanto had superior knowledge over the State and the Public concerning the true hazards of PCBs and the extent of environmental pollution caused by Monsanto.

39.    In 1969, Monsanto appointed an "ad hoc" committee on PCBs to address the "situation concerning environmental contamination through the manufacture and use of [PCBs]."

40.    The purpose of the committee was to implement a plan to conceal material information from the Public while at all times seeking to increase profits from the sales of PCBs. The stated objectives of the committee were to "Protect continued sales and profits of [PCBs]" and "Protect the image" of Monsanto in order to "Permit continued development of new uses and sales" of PCBs! (Ex. D).

41.     A memo setting out these objectives candidly acknowledged that "there is little probability that any action that can be taken will prevent the growing incrimination of specific [PCBs] as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds." (Id., p. 2). Notwithstanding, the committee suggested "a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular [PCBs] as well as to protect the continued use of other members of the [PCB] series." (Id.). Monsanto was very concerned about its profits: "There can not be too much emphasis given to the threat of curtailment or outright discontinuance of the manufacture and sales of this very profitable series of compounds." (Id., p. 11).

42.     Monsanto established early on a company policy to "Give no statements or publications which would bring the situation to the public's attention." (Ex. K).

43.     As part of their scheme to conceal, Monsanto set out to "cooperate" with government authorities in confidential discussions that were not disclosed to the Public. Monsanto touted its efforts to decrease the release of PCBs from the plant into the environment while failing to do anything about the pollution that had already occurred as a result of years of improper disposal. Monsanto failed to fully disclose to governmental authorities, including Alabama authorities, the extent of the pollution of the waters below Anniston and the long term adverse effects of PCBs already discharged into the environment. As a result, Alabama authorities did not comprehend the seriousness of the situation.

44.     In like manner, Monsanto decided to inform certain corporate customers of potential problems with PCBs while failing to disclose the long term effects on the environment. (See Ex. D,

p. 6) ("As the alarm concerning the contamination of the environment grows it is almost certain that a number of our customers or their products will be incriminated. The company could be considered derelict, morally if not legally, if it fails to notify all customers of the potential implication.").

45.     While deciding to confidentially inform certain governmental authorities and certain corporate customers of the potential dangers of PCBs, Monsanto made no effort to disclose to the Public the dangers of PCBs and the fact that the land around Anniston and the waters below had been contaminated with PCBs which will exist for years in the soil, sediment, and water.

46.     Indeed, Monsanto sought to conceal the extent of the problem from Alabama citizens. In November 1970, when contacted by the Anniston Star, Monsanto falsely represented that there was not "any cause for worry from the public health standpoint." Monsanto falsely represented that "no major quantities of PCBs leave the plant," and it wrongfully failed to disclose that even if the discharges ended immediately, dangerously high and unacceptable levels of PCBs would remain indefinitely in the waters and wildlife. At the same time, Monsanto issued a press release claiming that losses of PCBs from manufacturing plants had been "negligible" when Monsanto's own documents show that the losses over the last 40 years had been substantial and that the then current release was over 88 pounds of PCBs per day. Further, the attempts to decrease the release of PCBs were unsuccessful as high levels of PCBs in the waters and sediment continued to be recorded by Monsanto's own scientists.

47.     In 1975, an independent lab hired by Monsanto issued a report on cancer found in lab rats as a result of PCBs which concluded that PCBs were "slightly tumorigenic." In order to conceal this information, Monsanto requested the lab to change and falsify the report by changing the

description of from "slightly tumorigenic" to "does not appear to be carcinogenic" in order to avoid adverse publicity. (Ex. L).

48.     Monsanto's plan succeeded and they continued to profit from the sales of PCBs into the 1970s while at all times failing to warn of pollution of the Coosa River. Only the threat of a national ban on production and the pressure of the United States government stopped Monsanto from continuing to manufacture PCBs. Even after closing the Anniston plant, Monsanto continued to manufacture PCBs in Sauget, Illinois. The ban on production was too late because the damage to the environment had already been done.

Monsanto's Continued Pollution Of The Waters And Land And The Lasting Effects Of PCBs

49.     PCBs discharged into the environment over a period of 40 years by Monsanto polluted the waterways below the Anniston plant and adjoining lands. Because of their longevity, PCBs continue to exist in the water, sediment, soil and fish. Further, normal activities within creekbeds, riverbeds or lakebeds, including human activities, floods, operation of dams, construction, and snagging operations disturb the creekbeds, riverbeds and lakebeds, aggravating the release of PCBs into the water and further spreading the contamination.

50.     The situation is exacerbated by Monsanto's continuing failure to acknowledge the problem. Monsanto failed and continues to fail to properly monitor and cleanup its property which has resulted in the discharge of more PCB pollutants into the river and waterways due to run-off and leaking landfills.

51.     High levels of PCBs have been found in areas adjacent to abandoned landfills on Monsanto's property. PCBs have recently been found in storm water samples taken from ditches leading from the plant. The land all along these ditches are also heavily contaminated with PCBs.

In one area along the ditch, consultants found more than 200,000 ppm (parts per million) of PCBs in the soil. Under federal guidelines, any substance containing 50 ppm or more has to be disposed in a special hazardous waste landfill such as Emelle. A draft consultation report prepared by the Alabama Department of Public Health states that the land around the plant should be deemed a Public Health Hazard.

52.     Recent tests have found PCBs in the fish in Lake Logan Martin and Choccolocco Creek. In 1993, the Alabama Department of Environmental Management (ADEM) posted a "no consumption fish advisory" at Choccolocco Creek warning the Public not to eat any fish caught in the creek. (Ex. M).

53.     This year, a "Risk Assessment" prepared by the Alabama Department of Health found a high risk of cancer for adults who ate fish from Choccolocco Creek and projected that an excess of 5 out of every 100 persons who had eaten fish over a 50 year span from the creek are or will be afflicted with cancer or cancer related maladies.

54.     Despite the acknowledged existence of PCBs in the soil and in the waters below the Anniston plant, Monsanto refused to remove the PCBs from its landfills and to clean-up contaminated soil on its property and adjacent residential property. Indeed, until lawsuits were brought against it in the 1990s, Monsanto essentially made no meaningful effort to clean-up or alleviate the environmental hazard it had caused or to otherwise warn the Public, even after production of PCBs ceased in the 1970s and even after the national ban on production by the U.S. government. Instead, Monsanto attempted to close its eyes to the problem.

## The "Buy Out"

55.    Once Monsanto was "caught" and lawsuits were filed in the 1990s, Monsanto began to take action. Rather than acknowledge the problem, Monsanto has waged a vigorous defense to all claims of PCB contamination and denied any wrongdoing. Most egregiously, Monsanto still refuses to clean-up the environmental pollution it caused.

56.    To aid in its defense, Monsanto has initiated a "buy out" plan whereby Monsanto is attempting to purchase residential property around the Anniston plant which is undisputedly contaminated with PCBs. Monsanto has literally gone door to door attempting to convince under-educated and underprivileged residents to sell their property at inflated rates and to move away, thereby decreasing the number of possible Plaintiffs and witnesses and concealing the evidence of the extent of pollution of the area with PCBs.

57.    Monsanto has conducted soil testing of residential property around the plant but refused to provide and otherwise failed to openly and fairly disclose the results to the residents. In at least one instance, Monsanto purposely failed to disclose to residents the high levels of PCBs found on or near their property. Specifically, after residents Cassandra Roberts and her mother, Eloise Mealing, requested to see the test results, Monsanto sent, without proper explanation, a copy of the map of the neighborhood ostensibly showing the levels of PCBs found, but Monsanto redacted the portions of the map showing that high levels of PCBs (280-300 ppm) had been found on or near their property. (See Ex. N). Monsanto's effort to buy the problem to make it go away, while unavailing, is simply another example of its wanton disregard for the rights of the Plaintiffs.

## Plaintiffs And The Class Damaged

58.    At all times since 1931, Monsanto knew that Plaintiffs were living upon the shores of the Coosa River and ditches and tributaries leading from the plant to the River and were regularly fishing, boating and swimming in the PCB-contaminated waters.

59.    Moreover, Monsanto knew that the waterways leading from the plant to the Choccolocco Creek went through several underprivileged neighborhoods where children played in the ditches and on property adjoining these ditches where high levels of PCBs were found. In fact, Monsanto allowed residents to garden on a PCB-contaminated landfill located on its property and even built a softball field on the landfill.

60.    Residents along these ditches and Choccolocco Creek have suffered numerous health problems. Many residents have lost family members to cancer, including a four-year-old child who died of an extremely rare form of cancer. The Agency for Toxic Substance & Disease Registry recently conducted blood tests upon some of the residents living east of the plant and found extremely high levels of PCBs, prompting the Alabama Department of Health to declare this PCB contamination a public health hazard.

61.    Defendant's actions have damaged, contaminated and polluted property belonging to Plaintiffs and interfered with their right to use and enjoy their property. The actions of Defendant have diminished the value of property and increased the risk that Plaintiffs and the Class would experience health problems. The actions of Defendant increased the need for health monitoring. Monsanto's actions also caused fear and mental suffering. All of these damages and injuries were the proximate and natural consequence of Defendant's actions.

62.     Many of these residents could not and can not afford to individually litigate their claims against the chemical company.

**COUNT I**

**NEGLIGENCE**

63.     Plaintiffs incorporate herein by reference paragraphs 1 through 62, as if fully restated herein.

64.     Defendant negligently manufactured and disposed of PCB pollutants into the Coosa River and waterways.  Defendant failed to properly supervise the manufacture and disposal of PCBs.  Defendant failed and continues to fail to properly monitor and cleanup its property and landfills thereby negligently allowing the further discharge of PCBs into the Coosa River and waterways.

65.     Monsanto has a duty to Plaintiffs and others who own property around the plant and on the ditches and waterways below the plant to use due care, and Monsanto breaches this duty by its actions and inactions.

66.     As a direct and proximate result of Defendant's negligence, the Plaintiffs have been damaged and this injury was foreseeable.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek from the Defendant actual and compensatory damages, together with interest, attorneys' fees, costs and such other relief to which the Plaintiffs may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT II

## GROSS NEGLIGENCE, RECKLESSNESS, WANTONNESS

67.     Plaintiffs incorporate herein by reference paragraphs 1 through 62, as if fully restated herein.

68.     As more specifically described above, the Defendant has known of or consciously disregarded the hazards of PCBs, the discharge of PCBs into Alabama waters, and the effect of improper disposal of PCBs on Plaintiffs and their property.

69.     The Defendant consciously and deliberately released these toxins by improperly dumping PCBs into the sewer. Defendant consciously and recklessly failed to monitor PCBs buried on its property. Defendant continues to consciously allow PCBs to run off its PCB-contaminated land into the waterways and Coosa River.

70.     Monsanto has consciously and deliberately allowed these toxins to flow from its property and remain in the soil, sediment, and waterways, with the full understanding of the dangers and consequences to the Plaintiffs and the Public. For many years, Monsanto concealed the dangers and existence of PCBs in the soil and waters from the Public, including Plaintiffs. This conduct constitutes gross negligence, recklessness and/or wantonness which has been and continues to be a direct and proximate cause and/or contributing cause of the damages and injuries sustained by the Plaintiffs.

71.     The acts of the Defendant are intentional, willful, wanton, illegal, and done with conscious and deliberate disregard for the life, safety, rights and property of the Plaintiffs and others and as a result of these acts of the Defendant, the Plaintiffs are entitled to punitive damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs claim from the Defendant actual, compensatory and punitive damages, together with interest, attorneys' fees, costs and such other relief to which the Plaintiffs may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT III

## NUISANCE

72. Plaintiffs incorporate herein by reference paragraphs 1 through 62, as if fully restated herein.

73. Defendant intentionally, wrongfully and illegally created a private and public nuisance and interfered with the Plaintiffs' right to use and enjoy their property.

74. As a result of Defendant's actions, Plaintiffs have been and continue to be damaged.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs claim from the Defendant actual, compensatory and punitive damages, together with interest, attorneys' fees, costs and such other relief to which the Plaintiffs may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT IV

## RIPARIAN RIGHTS

75. Plaintiffs incorporate herein by reference paragraphs 1 through 62, as if fully restated herein.

76. The use made by Defendant of the Coosa River, and the waterways and tributaries leading into the River, was unreasonable and improper. Defendant intentionally and wantonly polluted and impaired the quality of the water, to the prejudice of Plaintiffs, lower riparian owners

and users of the water. Defendant has rendered the waterways and Coosa River unfit for their normal uses.

77.     As a result of Defendant's actions, Plaintiffs have been and continue to be damaged.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs claim from the Defendant actual, compensatory and punitive damages, together with interest, attorneys' fees, costs and such other relief to which the Plaintiffs may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT V

## INJUNCTIVE RELIEF

78.     Plaintiffs incorporate herein by reference paragraphs 1 through 62, as if fully restated herein.

79.     As more specifically alleged above, Defendant continues to cause and allow PCBs to pollute the Coosa River and the environment. Defendant has failed to monitor and properly clean-up its property in Anniston, including the landfills on the property.

80.     Defendant's actions and inactions present a serious threat to the rights of the Plaintiffs and the public at large.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek an injunction against Monsanto ordering it to clean-up its property at the Anniston plant, including the landfills located on the property, and to remove any and all PCBs from its property.

## CLASS ACTION

81.     Plaintiffs incorporate herein by reference paragraphs 1 through 80, as if fully restated herein.

82.     Plaintiffs aver that they and the Class members acquired or maintained homes or land on the ditches, tributaries and waters below the Anniston plant for residential and recreational purposes, including fishing from the waters, eating the fish, and swimming in the water. Because of the presence of PCBs in the soil, sediment, water and fish, Plaintiffs have been deprived of the full use and enjoyment of their land, and have suffered a decline in the value of their property.

83.     Plaintiffs aver that they and the Class fear health problems, and that these fears are reasonable. Plaintiffs aver that they and the Class have suffered mental distress and fear for their health, based on their continued exposure to PCBs and pollutants from Monsanto's Anniston Plant.

84.     Plaintiffs aver that (1) joinder of all members of the Class is impractical; (2) there are questions of law or fact common to the claims of the Class, including all factual allegations contained in paragraphs 1 through 61 of this Amended Complaint and the questions of law contained in paragraphs 62 through 79 of this Amended Complaint; (3) the claims of Plaintiffs are typical of the claims of the Class; (4) Plaintiffs in their representative capacity will fairly and adequately protect the interests of the Class; (5) questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and (6) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

85.     The prosecution of separate actions by individual members of the Class would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the Defendant, and/or (b) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

86.    The Class consists of all persons who, since 1993, have owned, leased or licensed land located around the Monsanto chemical plant in Anniston and on the ditches and tributaries leading from the plant and on the waterways below the plant on Snow Creek, Choccolocco Creek and the Coosa River, including Lake Logan Martin, Lay Lake, and Lake Mitchell.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request the court to certify this action as a class action on all counts in the Amended Complaint as set forth above.

D. Frank Davis
Gerald P. Gillespy
Pamela M. Arenberg
Gary L. Howard

OF COUNSEL:
BURR & FORMAN
420 North 20th Street
3100 SouthTrust Tower
Birmingham, Alabama  35203
(205) 251-3000

J.L. Chestnut, Jr.

OF COUNSEL:
CHESTNUT, SANDERS, SANDERS & PETTAWAY
P.O Box 1305
Selma, AL 36702-1305
(334) 875-9264

**JURY DEMAND**

Plaintiffs demand a trial by jury of all issues triable of right by a jury.

Of Counsel

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the Second Amended Complaint upon the following:

Warren B. Lightfoot, Esq.
LIGHTFOOT, FRANKLIN, WHITE & LUCAS
300 Financial Center
505 N. 20th Street
Birmingham, Alabama 35203

by hand delivery on this the 17th day of May, 1996.

OF COUNSEL