IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

FILED
96 NOV 18 PM 3: 50
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| WALTER OWENS, CLAY ALBRIGHT, BOBBY LEWIS, JILL MCCULLARS, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MONSANTO COMPANY, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) CV 96 P 0440 E <br> ) <br> ) <br> ) <br> ) |

## MONSANTO COMPANY'S RESPONSE TO PLAINTIFFS' ALTERNATIVE MOTION FOR CLASS CERTIFICATION IN RESPONSE TO MOTION TO INTERVENE AND RESPONSE TO MOTION TO INTERVENE

## I.

## INTRODUCTION

"Plaintiffs' Alternative Motion for Class Certification in Response to Motion to Intervene" ["Plaintiffs' Alternative Motion"] is merely the latest in a series of efforts to obtain class treatment of the litigation pending against Monsanto.[1] The confusion of alternatives in the motion itself demonstrate that class treatment is not appropriate in this

---

[1] Monsanto's "Response to Plaintiffs' Initial Submission in Support of Class Certification," at pp. 11-19, sets out the chronological sequence of various efforts to obtain class treatment of this and related litigation in other courts.

35

case. Moreover, the litany of objections raised by the Motion to Intervene filed on behalf of the clients of Stewart, Cody & Smith, P.C. ("Limited Intervenors") only serves to confirm in greater factual detail the objections raised (and fully briefed) in "Monsanto Company's Response to Plaintiffs' Initial Submission in Support of Class Certification" ["Monsanto's Initial Response"], dated August 15, 1996.

In "Plaintiffs' Initial Submission in Support of Class Certification" ["Plaintiffs' Initial Submission"], the plaintiffs proposed a class which they argued could be maintained under either Rule 23(b)(2) or (b)(3). Now, recognizing the validity of the objections raised to the proposed class by Monsanto and the additional confirmation of those objections provided by the Limited Intervenors' motion, plaintiffs offer a veritable "smorgasbord" of proposed classes and simply invite the Court to decide which class might possibly be appropriate. Plaintiffs' counsel apparently believe that the certification of a class, any class, will give them some tactical advantage over Monsanto or other plaintiffs' counsel, or both. Accordingly, in yet another admission that their proposed classes are unworkable, paragraph 4 of their motion candidly begs the Court to fashion its own class for them. Despite all of their efforts to stretch the bounds of Rule 23, plaintiffs' counsel simply cannot offer a class justifying certification under Rule 23. Regardless of the relief sought or the nature of the proposed class, Monsanto has clearly demonstrated that class certification should be denied.

## II.

## MOTION TO INTERVENE

Because the Court should deny certification of *any and all* of the purported

classes suggested by the plaintiffs, the motion of the Limited Intervenors should be denied as

unnecessary and moot.[2]  The Motion to Intervene does, however, give additional support to

the points made by Monsanto's Initial Response and the Court should consider the Limited

Intervenors' arguments as a further basis for denying class certification.  For example,

"Intervenors' Statement of Claim For Which Intervention Is Sought" ["Intervenors'

Statement"], at p. 2, confirms that "Intervenors' counsel already have filed individualized

suits against Monsanto on behalf of more than 250 of their clients [and] . . .intends to file

individual suits on behalf of 700 more of their clients. . . ."  "All of the clients of

Intervenors' counsel, many of whom are absent members of the putative class in this action,

would seek to opt out of this farcical class action if exclusion were available."  Intervenors'

Statement, at p. 6.


In addition, the Limited Intervenors' "Memorandum of Law In Support Of

Motion To Intervene" ["Intervenors' Memorandum"] leaves no doubt that the suits already

filed and to be filed by Limited Intervenors' counsel "will seek predominately monetary

compensation for property damages and personal injuries."  Intervenors' Memorandum, at p.

---

[2]    The Limited Intervenors' motion included a request to conduct discovery on the class
certification issue.  Because the participation of the Limited Intervenors is not necessary for the
Court to determine that the plaintiffs have failed to satisfy their burden for class certification
under Rule 23, there is no need for the discovery requested by the Limited Intervenors.

5. In fact, they affirmatively say that "a great number of the members of the putative class, including Intervenors and hundreds of other clients of Intervenors' counsel, *do not desire the relief sought in this action. . . .*" (Emphasis added) Intervenors' Memorandum, at p.6, fn. 4. They assert that "[t]he injunctive remediation proposed by plaintiffs may also impair or impede the interest that Intervenors have in their own potential remediation claims." Intervenors' Memorandum, at p. 10.

Finally, the Limited Intervenors assert that: "There can be little doubt that plaintiffs inadequately represent the interests of Intervenors. Intervenors seek to prosecute all of their claims relating to property damages and personal injuries. Intervenors seek primarily monetary relief." Intervenors' Memorandum, at p. 10. As pointed out by the Limited Intervenors, "such overwhelming non-support for class certification by the putative class constitutes sufficient grounds to deny class certification." Intervenors' Memorandum, at p. 10. Combined with Monsanto's previous arguments, the Limited Intervenors' arguments demonstrate that all of the class certification motions pending in this action should be denied.

## III.

## ALTERNATIVE MOTION FOR CLASS CERTIFICATION

A.      **Paragraph 1-Mandatory Property Damage Class**

Plaintiffs' reaction to the objections of Monsanto and the Limited Intervenors is predictable -- they shift ground yet again. Plaintiffs' Alternative Motion first proposes a

Rule 23(b)(2) class for property damage alone that would *include* the Limited Intervenors.[3] This alternative proposal continues to ignore completely the fact that no property damage class (whether certified under (b)(2) or (b)(3)) can satisfy the provisions of Rule 23 (a) in this case. See Monsanto's Initial Response, pp. 29-43. Simply suggesting a mandatory property damage class in lieu of carving out of the class all persons represented by other counsel does not alter the fact that a Rule 23(b)(2) class is not permitted if (a) the proposed injunctive relief is not applicable to the class as a whole, (b) monetary relief is the predominant relief requested, or (c) the injunctive relief is not necessary. See Monsanto's Initial Response, pp. 45-56.

**B.**     **Paragraph 2-Mandatory Class for Injunctive Relief and Punitive Damages; Opt-Out Class for Compensatory Property Damages**

Next, plaintiffs propose a Rule 23(b)(2) class of the same persons (*i.e.,* including the Limited Intervenors) as to injunctive relief and punitive damages only. This proposal suffers the same flaws as the previous proposal. Moreover, plaintiffs still do not show that they have complied with Rule 23(a) nor do they answer the legal and factual objections raised by Monsanto to the certification of a class as to injunctive issues and punitive damages. See Monsanto's Initial Response, Section D., pp. 44-61.

---

[3] Previously, plaintiffs' counsel proposed to exclude all persons within the class area who were represented by the Stewart law firm. Significantly, class members may not opt out of a 23(b)(2) class. As pointed out by the Limited Intervenors, many purported class members have already filed separate actions and a large number intend to do so in the future. Intervenors' Statement, p. 6. Thus, certification of a (b)(2) class may have an impact on pending or future litigation against Monsanto.

Significantly, plaintiffs tacitly concede that injunctive relief may not be appropriate with respect to property damages and therefore they propose a Rule 23(b)(3) class of the same persons (*i.e.*, including Limited Intervenors) as to "compensatory property damages." For all of the reasons already set out in Monsanto's Initial Response, this proposed class should not be certified. See Monsanto's Initial Response, Section E., pp. 62-79.

Each of these proposals amounts to little more than "tinkering" with the basic proposals made in the Plaintiffs' Initial Submission. Additional extensive briefing is not necessary because the proposals do not answer the fatal flaws pointed out in Monsanto's Initial Response.

## C.     Paragraph 3-Property Testing and Medical Monitoring

Next, however, the plaintiffs boldly attempt to inject a different proposal for two totally new forms of relief. Such relief has not previously been requested and there is no effort to define the class members for whom such relief is sought. This effort is made without a shred of factual support in the record and is based solely upon their own bald-faced assertions that a class seeking such remedies would be appropriate here. Again, plaintiffs are wrong.

1. __Certification of a (b)(2) Class for "Property Testing" and "Medical Monitoring" Would be Improper Because the Plaintiffs Have Failed to Define a Class and Plaintiffs Have Failed to Request Injunctive Relief In Their Complaint.__

Although Paragraph 3 of Plaintiffs' Alternate Motion asks for "a Rule 23(b)(2) or (b)(3) class as to (a) property testing and (b) court-supervised medical monitoring" (emphasis added), the motion fails even to define the proposed class.[4] As a result, this Court has no basis upon which to determine whether the requirements of Rule 23 have been met and the Court can and should deny the motion on this ground alone.[5]

Moreover, Plaintiffs' Memorandum Brief argues only for a 23(b)(2) class as to both forms of relief.[6] However, neither Plaintiffs' Complaint nor Intervenors' Complaint[7]

---

[4] Paragragh 2 of Plaintiffs' Alternative Motion incorporates the purported class definition set out in Paragraph 1. Paragraph 3, in contrast, neither incorporates the previous definition nor includes a class definition. At least as to medical monitoring, it would seem that the class of interested persons would not be limited to property owners as is true for all of the other proposed classes. On the other hand, an absentee property owner would presumably have no claim for medical monitoring.

[5] The legal and practical effects of plaintiffs' failure to propose a workable, rational class definition were briefed fully in Monsanto's Initial Response at pages 22-29.

[6] Plaintiffs' Memorandum Brief, at p. 6, argues for a 23(b)(3) class only as to "claims for compensatory property damages."

[7] On May 13, 1996, plaintiffs in an action entitled Otis Adams, et al. v. Monsanto Company, No. CV-96-C-0440-N (U.S.D.C., N.D. Ala.) ("Intervenors"), were permitted to intervene in this action.

requests either property testing or medical monitoring as injunctive relief.[8]  Since there is no

request for such injunctive relief,[9] it cannot form the basis of a class under Rule 23(b)(2).

Boughton v. Cotter Corp., 65 F.3d 823, 827 (10th Cir. 1995) (medical monitoring relief

sought was predominantly money damages and therefore class certification under Rule

23(b)(2) was not appropriate); see also Thomas v. FAG Bearings Corp., Inc., 846 F. Supp.

1400 (W.D. Mo. 1994).[10]


        Finally, even if one assumes that the plaintiffs intended to make such requests

for relief on behalf of the previously proposed class (i.e., the class proposed in Paragraph 1

of Plaintiffs' Alternative Motion), neither of these forms of relief is appropriate for class

treatment under 23(b)(2) for the reasons discussed below.

---

[8] Not only do Plaintiffs' Complaint and Intervenors' Complaint fail to request "property testing for PCBs at defendant's expense" as injunctive relief, they are completely silent on the issue.  Similarly, Plaintiffs' Complaint is completely silent on medical monitoring, and Intervenors' Complaint alleges "reasonable *compensatory damages* for the costs of medical testing, monitoring . . ." and "*expenses* for medical monitoring . . ." (Emphasis added) Intervenor's Complaint, ¶ 200(h) and (n).

[9] To the extent either Plaintiffs' or Intervenors' Complaint even mentions property testing or medical monitoring, the relief sought is monetary, not injunctive.

[10] The fact that Plaintiffs' Complaint is silent and Intervenors' Complaint seeks only monetary damages for medical monitoring is further evidence that this case is primarily and predominantly about money, regardless of how plaintiffs attempt to disguise it.  This issue was fully briefed in Monsanto's Initial Response, Section D. 2., pp. 46-61.

    The four cases relied upon by the plaintiffs, Plaintiffs' Memorandum Brief, p. 5, are distinguishable by the fact that, in each case, the court found that the relief sought was more than the mere payment of expenses for medical monitoring, but rather involved the on-going court supervision of an elaborate medical monitoring program.  Plaintiffs in this case have made no such prayer for relief.

### 2. There is No Factual or Legal Basis for Plaintiffs' Suggestion That (b)(2) Class Relief Should Include Property Testing for PCBs at Monsanto's Expense.

Plaintiffs assert that "based on defendant's repeated concerns about the exact amounts of PCBs on each class member's property, the (b)(2) class should include relief in the form of property testing for PCBs at defendant's expense."[11] Plaintiffs' Memorandum Brief, at p. 3. This statement is simply wrong. Monsanto's objections to the property class originally proposed by plaintiffs were not centered on measurement of the exact amounts of PCBs on each parcel of property. The objection to the proposed property class that plaintiffs mischaracterize is that plaintiffs have made no showing that PCBs are likely to be detected on the properties of the overwhelming majority of the purported class members.

As Monsanto points out in its Initial Response, Monsanto has already performed extensive sampling and that sampling negates plaintiffs' unfounded suggestion that PCBs have dispersed throughout the arbitrarily drawn one-mile radius around the Anniston plant or to all property adjacent to the five-mile stretch of Snow Creek. Sampling shows that PCBs are detected in ditches on or near the Anniston plant in which storm water flows away from the plant and in areas in the vicinity of these ditches that are subject to flooding from the ditches during rainfall events. Within the great majority of the proposed class area, the

---

[11] Plaintiffs' Complaint and Intervenors' Complaint not only fail to request "property testing for PCBs at defendant's expense" as injunctive relief, but are completely silent on the issue.

9

topography and storm water flow patterns preclude the potential for flooding from these drainage ditches which flow away from Monsanto's plant site. See Monsanto's Initial Response, pp. 24-26 and Exhibit 1 to Monsanto's Initial Response (Affidavit of Robert G. Kaley II, Ph.D.), ¶¶ 12, 15, 18 and 20. There is then simply no rational reason to test the huge number of properties within the large, widely diverse class area that plaintiffs propose.

Plaintiffs, not Monsanto, are the party seeking class certification, and plaintiffs accordingly bear the burden of establishing that all of the Rule 23 prerequisites for class certification are satisfied. Coleman v. Cannon Oil Co., 141 F.R.D. 516, 520 (M.D. Ala. 1992). Monsanto has raised the absence of evidence of actual PCB presence on the great majority of the properties in the arbitrarily drawn proposed class area as a reason why class certification should be denied. Monsanto has further shown that the actual evidence is that PCBs are detected on properties generally located in storm water drainage areas in close proximity to the Anniston plant. See Monsanto's Initial Response, pp. 24-25. In this context, it is absurd for plaintiffs even to suggest that Monsanto must respond at Monsanto's expense to Monsanto's own objections to class certification by testing each and every parcel of property in the proposed class area. It is not the intent of Rule 23 to require the party opposing class certification to address its own objections to certification of the class proposed by the adverse party.

Plaintiffs' attempt to force Monsanto to pay for testing for PCBs on all of the putative class members' properties as part of the relief for a proposed (b)(2) class is

tantamount to an effort by plaintiffs to use the proposed (b)(2) class to force Monsanto to bear the financial burden of trying to develop evidence to support the certification of the proposed (b)(3) class and the property damage claims associated with that proposed (b)(3) class. Plaintiffs are not seeking the discovery of information that is already available to Monsanto; instead, plaintiffs are seeking to have Monsanto spend substantial resources to attempt to generate information for the plaintiffs to try to use to support their case. Plaintiffs, not Monsanto, bear the burden of obtaining such evidence in support of their class and their claims. See McCleery Tire Service, Inc. v. Texaco, Inc., 1976 WL 1332, at *2 (E.D. Pa. 1976)("[d]efendant cannot be expected to provide information it does not possess" to support certification of plaintiff's proposed class).

Courts have consistently rejected attempts by plaintiffs to compel defendants to finance various aspects of plaintiffs' class action cases. For example, the United States Supreme Court emphasized in Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340 (1978), that "[a] bare allegation of wrongdoing, whether by breach of fiduciary duty or otherwise, is not a fair reason for requiring a defendant to undertake financial burdens and risks to further a plaintiff's case." Id. at 363. In Oppenheimer, the Court reaffirmed "the general principle that a party must bear the 'burden of financing his own suit,'" id. at 356 (quoting Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 179 (1974)), and held that the district court abused its discretion under Rule 23 by deciding that defendants should bear the expense of identifying the individual members of a class of shareholders. Id. at 363-64. The Court noted that the plaintiffs could obtain the information sought by paying a third party the same amount that

11

the defendants would have to pay to obtain the same information.  Id. at 363.  Similarly,

plaintiffs can obtain the PCB testing data they seek at their own expense by paying a

contractor (just as Monsanto would) to sample and analyze soil from putative class members'

properties.  See also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 179 (remarking on class

plaintiff's "ordinary burden of financing his own suit"); In re Franklin Nat'l Bank Sec.

Litig., 574 F.2d 662, 672 (2d Cir. 1978)(partially vacating district court's order because "the

District Court was not authorized by Rule 23 to direct the defendants to pay . . . for the

mailing of notices or otherwise implementing the prosecution of the action against them").


     In Neloms v. Southwestern Elec. Power Co., 72 F.R.D. 128 (W.D. La.

1976), the court stated that it "cannot agree" with the plaintiffs' suggestion that the

defendants should bear part of the cost of sending notice to class members.  Id. at 131.  The

court reasoned that "[p]laintiffs' argument, pursued to its logical extension, would require the

defendant, or the party opposing the class, to ensure the protection of the class he opposes.

Rule 23 squarely places that duty on the class representative."  Id.  Plaintiffs' argument that

Monsanto should be required to test proposed class members' properties for PCBs would

similarly require Monsanto to attempt to "ensure the protection of the class" Monsanto

opposes.  Plaintiffs' effort to foist the responsibility to test proposed class members'

properties on Monsanto suggests that plaintiffs are not adequate class representatives under

Rule 23(a)(4).  Id. ("If plaintiffs purport to represent the unidentified class members, and

they cannot or will not support the cost . . . then they cannot be said to represent the

interests of the unidentified parties adequately.").  See also In re Nissan Corp. Antitrust

Litig., 552 F.2d 1088, 1102 (5th Cir. 1977)("Upon commencing a class action, the class representatives must be prepared to accept the concomitant responsibility of identifying absentee class members as well as paying the costs of their individual notice.").

To the extent that any proposed (b)(3) class would seek to include individuals on whose properties PCBs are detected at or above a certain level, plaintiffs' request for Monsanto to bear the expense of testing putative class members' properties for PCBs also constitutes an impermissible attempt to shift to Monsanto the burden of identifying individual members of the class. See, e.g., Oppenheimer, 437 U.S. at 362 ("In the context of a lawsuit in which the defendants deny all liability, the imposition on them of a threshold expense of $16,000 to enable the plaintiffs to identify their own class can hardly be viewed as an insubstantial burden."); Dudo v. Schaffer, 91 F.R.D. 128, 138 (E.D. Pa. 1981)("plaintiff bears the burden of establishing, as soon as it is practicable, that a purported class action is properly certifiable under Rule 23" and "[p]art of his burden in this regard is to identify sufficiently the members of the class"); Oscar Gruss & Son v. Geon Industries, Inc., 89 F.R.D. 32, 37 (S.D.N.Y. 1980)("cost of identifying class members is part and parcel of the cost of notifying class members" and "[i]f the class representative is unwilling to assume the burden of notifying the class, the action must be dismissed").

3. **There is No Factual or Legal Basis for Plaintiffs' Suggestion That (b)(2) Class Relief Should Include Medical Monitoring.**

Plaintiffs' request for "medical monitoring" treats this concept as if it were an established claim and/or remedy. Significantly, no appellate court has held that "medical monitoring" is an available remedy under the law of Alabama, much less an independent cause of action.[12] Plaintiffs' Alternative Motion cites no Alabama case to support a claim for medical monitoring. To certify a class and give notice to a large, diverse group on the basis of a claim that does not exist under Alabama law would be improvident.

Plaintiffs' Alternate Motion also fails to define what is meant by "medical monitoring."[13] Despite the intuitive allure of such a concept, however, it not a simple matter, either legally or medically. Its complexity makes it particularly inappropriate for class treatment.[14]

Solely for the purpose of demonstrating that such a claim for relief would be totally inappropriate for class treatment, Monsanto has reviewed cases from the few other jurisdictions which have considered the medical monitoring issue. In addition, Monsanto has

---

[12] *Compare* In re Paoli Railroad Yard PCB Litig., 916 F.2d 829, 852 (3d Cir. 1990); 35 F.3d 717 (3d Cir. 1994) (forecasting Pennsylvania law)*with* Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 979 (Utah 1993).

[13] The closest plaintiffs come to describing their idea of medical monitoring is the statement that "[a] medical monitoring class would enable all affected residents to be tested for PCBs and related health problems at defendant's expense." Plaintiffs' Alternative Motion, p. 5.

[14] Although an inquiry into the merits of plaintiffs' claims is not generally an element of the Court's consideration of whether to certify a class under Rule 23, "it is often necessary to analyze the substantive claims and defenses and the essential elements of those claims and defenses." Cook v. Rockwell Intern. Corp., 151 F.R.D. 378, 381 (D.Colo. 1993).

presented to this Court expert testimony on the subject of medical monitoring and its

relevance to the facts presented by these plaintiffs. The cases from other jurisdictions as

well as the experts have identified the very stringent requirements which must be met before

medical monitoring should be considered and the very narrow and unusual circumstances that

must exist to meet those requirements. See Affidavit of Dr. Brian G. Forrester ("Forrester

Affid.") attached as Exhibit "A"; see also In re Paoli Railroad Yard PCB Litig., 916 F.2d

829, 852 (3d Cir. 1990); 35 F.3d 717 (3d Cir. 1994) (forecasting Pennsylvania law); Bocook

v. Ashland Oil, Inc., 819 F.Supp. 530, 537 (S.D.W.Va. 1993) (applying Kentucky law);

Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 979 (Utah 1993); and Theer v. Philip

Carey Co., 628 A.2d 724, 733 (N.J. 1993).


The following requirements of the plaintiff's proof appear in the discussions of

"medical monitoring":

- That the plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant.

- That, as a proximate result of the exposure, the plaintiff suffers a significantly increased risk of contracting a particular, identified serious latent disease.

- That the increased risk makes periodic diagnostic medical examinations reasonably necessary.

- That monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

- That the monitoring must be different from that required for usual medical care.

At least two of these courts, Bocook (Kentucky law) and Theer (New Jersey), required that

the plaintiff actually have suffered an injury or condition resulting from the exposure. On

the other hand, <u>Paoli</u> (Pennsylvania) and <u>Hansen</u> (Utah) held that the concept of medical monitoring only applies in the absence of present manifestations of physical injury.

These determinations are highly individualized. Monsanto does not believe that such determinations could ever be made on a class-wide basis. Nevertheless, in the present case, plaintiffs have not even presented evidence to suggest that the overwhelming majority of purported class members have any exposure to PCBs, let alone a "significant exposure." Even in the medical monitoring cases relied upon by plaintiffs, the courts rightly placed the burden on the party invoking Rule 23 to define a class and present sufficient evidence from which the court could determine that the definition of the class bore a reasonable relationship to the evidence of exposure. <u>See</u>, <u>e. g.</u>, <u>Cook v. Rockwell Int'l Corp.</u>, 151 F.R.D. 378, 383-84 (D.Co. 1993).

In <u>Cook</u>, plaintiffs presented expert testimony and evidence of class wide exposure such that the court found that the plaintiffs' proposed class bore a reasonable relationship to the evidence of exposure. Here, plaintiffs present no class definition, no expert testimony, and no evidence of class wide exposure. Even assuming plaintiffs were requesting a medical monitoring class for everyone who lived within a one mile radius of the plant and along Snow Creek, plaintiffs have utterly failed to present any evidence to suggest that such a definition bears a reasonable relationship to evidence of exposure to PCBs. As has already been discussed, given that there is no reason to believe that PCBs are present at any level to create even the potential for "significant exposure" on all or even a significant

number of the properties within a one mile radius of the Anniston plant and along Snow Creek, there is no evidence to support an allegation that all or even a significant number of the people living in that area have the potential for "significant exposure" to PCBs.

Equally important to the issue at hand, and as mentioned above, the elements to be considered in assessing a claim for medical monitoring require individualized, not class-wide, determinations.[15] For example, as established in the affidavit of Dr. Forrester, neither the opportunity for exposure nor whether there has been a toxicologically significant dose can be determined on a class-wide basis. See Forrester Affid., at ¶¶ 8 and 9.

From a medical standpoint, in addition to the individualized issues of significant exposure and significantly increased risk, the determinations of reasonable necessity of diagnostic examinations, the existence of tests making detection and treatment possible, and what monitoring is necessary beyond usual medical care are highly individualized and should not be made on a class-wide basis. Dr. Forrester points out other

---

[15] Even for members of the proposed class who allege some basis for potential exposure, the allegations of how they were potentially exposed vary widely: consumption of allegedly contaminated drinking water, dermal contact with allegedly contaminated soil, inhalation of particulate matter in smoke, inhalation of allegedly contaminated dust, ingestion of allegedly contaminated food, and other alleged routes of potential exposure. The potential for varying exposure through these multiple, possible exposure pathways can only be determined on an individual, plaintiff-by-plaintiff basis. That potential will vary depending upon a number of diverse factors, including property locations, time of residence, length of residence, eating habits, drainage patterns, concentration levels, and the various uses of various properties by each purported individual class member. Moreover, even though a potential for exposure may exist, that does not mean that a particular individual received a toxicologically significant dose. See Forrester Affid. at ¶¶ 8-9.

factors which must be considered on an individualized basis in making a medical monitoring determination, including:

- Whether there is an accurate and feasible test with sufficient specificity, sensitivity and predictive value to detect the latent disease.

- The likelihood that the test will predict any latent disease in the particular plaintiff, taking into account factors such as age and gender.

- The risk that the plaintiff may be harmed by the test, including the risk of physical harm, false positives, and false negatives.

- Whether an effective treatment exists that will improve the patient's health outcome in the event disease is detected.

- Whether the benefits of medical monitoring outweigh the risks to the plaintiff.

See Forrester Affid. at ¶¶ 8-15.

As stated by Dr. Forrester: "[I]t would be contrary to fundamental and accepted principles of medicine to determine the appropriateness of a medical monitoring program for each and every member of the proposed class on an across-the-board basis for the entire group upon consideration of the medical circumstances of the four class representatives." Forrester Affid., at ¶ 7.[16]

As a consequence of the highly specific and individualized nature of a claim for "medical monitoring," as it has been conceptualized by the courts and explained by

---

[16]Dr. Forrester's affidavit was prepared in anticipation of an earlier scheduled hearing on class certification in this case which was postponed. While the scope of the proposed class and the identity of the proposed class representatives have been changed by plaintiffs' counsel, the statements in Dr. Forrester's affidavit still apply.

medical professionals, the medical monitoring claims of the representative plaintiffs would rarely, if ever, be typical of the claims of other members of the class. Therefore, it would be difficult, if not impossible, for the class representatives to adequately protect the interests of each member of the class. Thus, the plaintiffs fail the first hurdle, Rule 23(a).

In conclusion, the medical monitoring relief sought by the plaintiffs is solely monetary damages, not injunctive relief. Moreover, even if the relief requested by the plaintiffs was construed to be injunctive, because the claim of each member of the class is specific and individual to that claimant, plaintiffs cannot meet the requirement of Rule 23(b)(2) that the injunctive relief must be appropriate to the class *as a whole*. The difficulty was succinctly explained by the Second Circuit Court of Appeals in <u>In re Agent Orange Prod. Liab. Litig.</u>, 818 F.2d 145 (2d Cir. 1987), when it held that the a class based on claims of personal injury was unworkable because:

> The relevant question, therefore, is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it *did* cause harm and to whom. That determination is highly individualistic, and depends upon the characteristics of individual plaintiffs (*e.g.*, state of health, lifestyle) and the nature of their exposure to Agent Orange. Although generic causation and individual circumstances concerning each plaintiff and his or her exposure to Agent Orange thus appear to be inextricably intertwined [at the time the class was certified by the district court], the class action would have allowed generic causation to be determined without regard to those characteristics and the individual's exposure.

<u>Id</u>. at 165.

## IV.

### CONCLUSION

For the foregoing reasons, Monsanto Company respectfully requests that the Court (1) deny the motion to intervene, (2) consider the motion to intervene and supporting memorandum as an *amicus curiae* brief in opposition to the Plaintiffs' Alternative Motion for class certification, and (3) deny the Plaintiffs' Alternative Motion.

_____
One of the Attorneys for Monsanto Company

OF COUNSEL
Warren B. Lightfoot
Adam K. Peck
William S. Cox III
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
300 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 581-0711

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing pleading on D. Frank Davis, Esq., Pamela M. Arenberg, Esq. and Gary L. Howard, Esq., Burr & Forman, 3100 SouthTrust Tower, 420 North 20th Street, Birmingham, Alabama 35203; J.L. Chesnut, Jr., Esq., Chesnut, Sanders, Sanders & Pettaway, P.O. Box 1305, Selma, Alabama 36702-1305; Joe Thomas, Esq., 650 Poydras Street, Suite 1020, New Orleans, Louisiana 70130; Grover Hankins, Esq., Texas Southern University, 3100 Cleburne Avenue, Houston, Texas 77004; W.L. Williams, Jr., Esq., 1825 13th Way, S.W., Birmingham, Alabama 35211; David A. Sullivan, Esq., 2240 9th Avenue North, Birmingham, Alabama 35203, by hand delivery, by facsimile or by U.S. mail on this the _____ day of November, 1996.

_____
Of Counsel

cc:    Donald W. Stewart, Esq.
       Gary P. Cody, Esq.

21


EXHIBIT

A

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | |
|---|---|
| **WALTER OWENS, et al.** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.: CV-96-0440-W** |
| ) | |
| **MONSANTO COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |

**AFFIDAVIT OF BRIAN G. FORRESTER, MD, MPH, FACPM**

| | |
|---|---|
| **STATE OF ALABAMA** ) | |
| ) | |
| **JEFFERSON COUNTY** ) | |

## I.    QUALIFICATIONS

1.    My name is Brian G. Forrester, MD, MPH, FACPM.  I am over the age of 21 and am competent to testify regarding the matters and opinions set forth in this affidavit.  I am currently an assistant professor in the Division of Occupational and Environmental Medicine at the University of Alabama School of Medicine, Birmingham, Alabama; an assistant professor in the Division of Environmental Health, School of Public Health, University of Alabama at Birmingham; and a member of the graduate school faculty in the Graduate School, University of Alabama at Birmingham.  A true and correct copy of my Curriculum Vitae is attached to this affidavit as Exhibit "1."

2.    In 1980, I received a Bachelor of Science degree in Chemistry from the University of Georgia, Athens, Georgia.  I was awarded a medical degree from the School of Medicine at Emory University, Atlanta, Georgia in 1984 and a Master of Public Health from

Johns Hopkins University School of Hygiene and Public Health in Baltimore, Maryland. I am board certified by the American Board of Preventive Medicine with a specialty in occupational medicine and am a fellow in the American College of Preventive Medicine. I have taught undergraduate, graduate, and medical school courses and conducted research in the diagnosis, treatment, and prevention of illnesses associated with occupational and environmental exposures to a variety of substances. In stating the opinions set forth in this affidavit, I have relied upon my experience in developing medical monitoring programs in the occupational health field, and on my understanding and review of scientific literature relating to medical monitoring.

II.     BACKGROUND

3.      I have been retained by Monsanto Company in connection with the plaintiffs' motion to certify a class of property owners on Snow Creek, Choccolocco Creek, and Lake Logan Martin. It is my understanding that the plaintiffs seek to certify a class to determine Monsanto's liability for "medical monitoring." Although the exact nature of the medical monitoring sought by the plaintiffs is not specified, for purposes of this affidavit, I have assumed that the term is used to mean the medical evaluation of persons with a significant exposure to a toxic compound who have a significantly increased risk of disease as a result of such exposure, and the use of diagnostic tests to uncover latent disease so as to achieve a better health outcome that if such latent diseases became symptomatic. I further understand that the plaintiffs base their claim for medical monitoring for all of the members of the class upon their alleged environmental exposure to polychlorinated biphenyls ("PCBs").

4.    It is further my understanding that the plaintiffs seek to have their claims for medical monitoring determined through a class action under the Federal Rules of Civil Procedure.  It is my understanding that a class action procedure would determine the specific claims of a group of two "representative plaintiffs," then apply the results of that determination to all other members of the "putative class."

III.    SUMMARY OF OPINIONS

5.    In my opinion, there is no proven causal connection between occupational or environmental PCB exposure and adverse health outcomes in humans, other than chloracne.

6.    However, regardless of one's conclusion as to the adverse health outcomes in humans, it would be medically inappropriate to subject the putative class members to a medical monitoring program (a) without evidence that each individual has been significantly exposed to and received a dose of PCBs; (b) without evidence that each individual is at significantly increased risk of disease due to their alleged exposure to PCBs; (c) without evidence that the proposed screening tests and follow-up diagnostic testing meet widely-accepted criteria of accuracy and reliability; and (d) without evidence that the ensuing treatment would be beneficial to the patient.

7.    Finally, in my opinion, it would be contrary to fundamental and accepted principles of medicine to determine the appropriateness of a medical monitoring program for each and every member of the proposed class on an across-the-board basis for the entire group upon consideration of the medical circumstances of the four class representatives.

## IV. BASES OF OPINIONS

8. A determination as to whether a medical monitoring program is appropriate can only be made after a responsible assessment of the health risks faced by the individuals to be monitored. The analysis follows a series of sequential steps, each of which must be satisfied before an informed decision can be made on whether such monitoring is appropriate. The threshold question is: Has the individual been exposed to and received a dose of the substance of concern?

9. Before a responsible physician would recommend that any individual submit to "medical monitoring" based upon an alleged environmental exposure to a substance, the physician would require that the individual establish that he or she has, in fact, been exposed to the substance. Merely coming in contact with a substance does not necessarily result in a biologically significant dose or uptake into a person's body. There must be a route of exposure by which the substance is permitted to enter the individual. The nature and extent of the contact, the route of exposure, and the individual's dose, among other things, all vary widely and must be determined on an individual basis. Where health risks are alleged to have resulted from a population's exposure to an allegedly toxic chemical, a medical monitoring program designed without reference to whether each individual who would be subjected to the program has actually been exposed to (i.e., received a dose of) the toxic chemical would be counter to accepted principles of both internal and occupational medicine.

10. Even if exposure to a known toxic chemical were established, before recommending that a monitoring program be administered, a responsible physician should determine that exposure to that chemical increases the risk of contracting the disease or

4

condition targeted by the test. This determination involves an assessment of the toxicity of the substance; however, the toxicity of any substance is directly dependent on the dose received by the person as well as other behavior and characteristics of the individual. It is not feasible to resolve issues of exposure and increased risk except on an individual basis. Determinations of exposure and the risk associated with that exposure require a patient-by-patient investigation that would include for each person, among other things, the collection of occupational and environmental histories and biomonitoring. Without some proof of a significant exposure to the specific substance of concern resulting in a significantly increased risk of disease, no responsible physician would recommend that an individual, much less an entire population, undergo medical monitoring procedures.

11. Even if an individual establishes an exposure to an environmental contaminant and an increased risk as a consequence of such exposure, it does not necessarily follow that medical monitoring should be prescribed for such person. It certainly does not follow that testing should be mandated for an entire population. General guidelines have been developed by the medical profession for use by physicians in evaluating the effectiveness of medical monitoring procedures. These criteria, developed in large part by the American College of Physicians, the U. S. Public Health Service and the Canadian Task Force, are:

(1) The test must look for a *defined disease.*

(2) Early detection must lead to treatment that *improves the patient's outcome or function.*

(3) The test must be *feasible*--relatively easy to apply and not harmful to the patient.

5

(4)     The test must be *accurate*.

12.     Implementation of these criteria requires that consideration be given to a number of factors to determine whether the specific person to be tested would receive any benefit from medical monitoring. In developing a medical monitoring program, an occupational physician should be familiar with the available evidence linking the application of each proposed screening test with the occurrence of health outcomes. This evidence includes information on the sensitivity, specificity, and predictive values of the test (see, paragraph 13, infra) and the prevalence of the targeted condition. Data confirming that the post-test probability of detection exceeds the pre-test probability of detection are also imperative. The physician should then also take into account individual facts and preferences about the relative value of benefits and harm relating to the tests. For example, rarely if ever should a screening test be prescribed for a group of individuals without reference to the age and gender of each member of that group.

13.     The first important factor in determining whether to prescribe medical monitoring for a given person is the efficacy of the screening test or medical monitoring procedure. To meet this criteria, the test or tests must be able to detect the target condition earlier than without screening and with sufficient accuracy to avoid producing large numbers of false positive and false negative results. For medical monitoring, the accuracy of a test is measured as sensitivity, specificity, and positive predictive values.

(a) "Sensitivity" refers to the ability of a test to detect the condition of concern. In other words, since no test is 100% accurate, how often will the test detect the condition when it is present? A test that is not sensitive will miss some cases, leading to large numbers of false negative results (where the test results erroneously indicate that a person

6

who has a condition does not have it). This may give a patient a false sense of security and may result in delays in seeking medical attention if symptoms develop.

(b) "Specificity" refers to the proportion of persons without the condition of concern who test negatively when screened. It is the ability of the test to exclude correctly the condition. A test with poor specificity may result in patients being told incorrectly that they have the condition (false positive results). False positive tests often lead to follow up procedures that can be intrusive, expensive, and on occasion harmful.[1]

(c) "Positive predictive value" is defined as the proportion of positive results that are actually correct (true positives). A test with a low positive predictive value can generate more false positive results than true positive results, depending upon the prevalence of the disease in the population subject to the screening test.

In light of the harms posed by medical monitoring, it would be medically irresponsible to apply all monitoring tests to all people. Rather, a doctor should recommend medical monitoring only after evaluating, as to each specific patient, whether the benefits of the particular tests outweigh the risks.

---

[1] When you have a false positive, the patient is unnecessarily subjected to additional tests and additional therapy, which can harm and even kill them. For example, if a patient presented with a history of obesity and alcohol use, and a doctor performed a liver function test on that individual, it is quite likely that the test results would indicate serious liver disease. That test would be followed up by further tests and, ultimately, one might perform a needle biopsy of the liver to determine whether the disease actually exists in the patient. Because of the known risks inherent in any surgical procedure, this could result in bleeding or hematoma, requiring the patient to be taken to the operating room and placed under general anesthesia, thus increasing the chance of morbidity and mortality. A prudent physician would only have told the patient to lose weight and stop drinking alcohol.

14.    A second important factor for consideration is the effectiveness of early detection through a monitoring program.  It is generally recognized that medical monitoring should only be used when early detection of a condition using a screening test would lead to a better clinical outcome for the person monitored than for those persons who are detected without screening.  Early detection should lead to the implementation of clinical treatments that will prevent or delay the progression of the condition.  If there is no clinical intervention that will benefit the person proposed to be monitored, monitoring for the condition serves no valid medical purpose, is costly, and may be harmful.

15.    An evaluation of the risks and benefits of medical monitoring can only be done with respect to the individual patient.  The guidelines developed by the medical profession require that screening tests be considered on an individual basis so that an individual determination can be made that the benefits outweigh the risks.  Because the advisability of medical monitoring varies from patient to patient, no responsible physician would recommend medical monitoring on a group such as the plaintiffs in these cases.

V.    CONCLUSION

16.    In my opinion, there is no established, proven causal connection between occupational or environmental exposure to PCBs and adverse health effects in humans, with the exception of a skin condition known as chloracne.  However, even if it is assumed that there are potential adverse effects associated with environmental exposure to PCBs, no responsible physician would recommend, based solely on the medical circumstances of only two individuals, that all property owners along Snow Creek, Choccolocco Creek or Logan Martin Lake submit to a medical monitoring program in an effort to detect any one of several unknown potential adverse health effects.  Moreover,

8

without evidence (1) that an individual has been exposed to and received a dose of PCBs, (2) that an individual has a significant risk of some disease as a consequence of such exposure, and (3) that the proposed screening tests meet accepted criteria for accuracy and effectiveness and are appropriate for the medical circumstances of the individual being tested, and (4) that medical intervention would be beneficial for the individual, no medical monitoring program is necessary or advisable. In my opinion, an evaluation of the risks and benefits of medical monitoring can be done only with respect to the individual patient. The guidelines developed by the medical profession require that screening tests be considered on an individual basis so that an individual determination can be made that the benefits outweigh the risks. Because the advisability of medical monitoring varies from patient to patient, no responsible physician would recommend medical monitoring on a group such as the plaintiffs in these cases.

FURTHER AFFIANT SAYETH NOT.

Brian G. Forrester, MD, MPH, FACPM

Sworn to and subscribed
before me on this the
15th day of May, 1996.

Notary Public

My Commission Expires 10/9/97

9

EXHIBIT

/

# CURRICULUM VITAE

**BRIAN G. FORRESTER, MD, MPH, FACPM, FACOEM**

1805 Cedarwood Lane
Birmingham, AL 35244
(205) 426-2490

930 South 20th Street
Birmingham, AL 35205-2610
(205) 934-7303; Fax: 975-4377

## EDUCATION

1990   MPH   Johns Hopkins University School of Hygiene and Public Health
Baltimore, MD

1984   MD   Emory University School of Medicine, Atlanta, GA

1980   BS   University of Georgia, Athens, GA (Chemistry)

## POSTGRADUATE TRAINING

Occupational Medicine Residency, Johns Hopkins University School of Hygiene and Public Health, Division of Occupational Health, Baltimore, MD, 7/89 - 6/91

Flexible Internship, Naval Hospital San Diego, San Diego, CA, 7/84 - 6/85

## LICENSURES

1985   Diplomate, National Board of Medical Examiners

1991 - Present   Alabama
1989 - Present   Maryland (inactive)
1987 - Present   Georgia

## BOARD CERTIFICATION/FELLOW STATUS

1992   American Board of Preventive Medicine, *Specialty in Occupational Medicine*

1993   Fellow, American College of Preventive Medicine

1995   Fellow, American College of Occupational and Environmental Medicine

1

## HOSPITAL PRIVILEGES

1991-Present  University of Alabama Hospital, UAB, Birmingham, AL
1994-Present  Veterans Administration Hospital,  Birmingham, AL

## APPOINTMENTS

| | |
|---|---|
| 7/94 to present | Assistant Director<br>University of Alabama at Birmingham<br>Occupational and Environmental Medicine Residency Program |
| 3/92 to Present | Assistant Professor<br>Division of Occupational and Environmental Medicine<br>University of Alabama School of Medicine , Birmingham, AL |
| 7/93 to present | Assistant Professor<br>School of Public Health<br>Division of Environmental Health<br>University of Alabama at Birmingham, Birmingham, AL |
| 5/94 to present | Assistant Professor<br>Graduate School<br>University of Alabama at Birmingham, Birmingham, AL |
| 6/91 to 3/92 | Instructor<br>Division of Occupational and Environmental Medicine<br>University of Alabama School of Medicine, Birmingham, AL |
| 6/91 to 7/93 | Instructor<br>School of Public Health<br>University of Alabama at Birmingham, Birmingham, AL |

## PROFESSIONAL ACTIVITIES

Coursemaster, "Occupational and Environmental Diseases", ENH 620, UAB School of Public Health, Fall 1995 to present.

Coursemaster, "Occupational and Environmental Medicine Seminar Series", ENH 692, UAB School of Public Health, Fall 1995 to present.

Course Director, "Basic Curriculum in Occupational Medicine: A Short Course for Physicians Involved in Worker Health", sponsored by: The Deep South Center for Occupational Health and Safety, University of Alabama at Birmingham, The Ministry of Health of Aruba, and the Social Insurance Bank of Aruba. Oranjestad, Aruba, 6/5/95 to 6/12/95.

Vice President, Alabama Occupational and Environmental Medicine Association, 9-95 to 9-96.

Course Director, NIOSH Approved Pulmonary Function Testing Training and Refresher Course, Deep South Center for Occupational Health and Safety, University of Alabama at Birmingham, 11/94 to present.

Secretary/Treasurer, Alabama Occupational and Environmental Medicine Association, 9-94 to 9/95.

Member, Clinical Occupational Toxicology Committee, American College of Occupational and Environmental Medicine, 1-94 to present.

Board of Directors, Alabama Occupational and Environmental Medicine Association, 9-93 to 9-94.

Member, Occupational Medicine Practice Committee, American College of Occupational and Environmental Medicine, April, 1993 to 1996.

Member, Planning Committee, Occupational Medicine Update, Deep South Center for Occupational Health and Safety, University of Alabama at Birmingham, Destin Florida, 1992-present.

## PROFESSIONAL ACTIVITIES *(Continued)*

Member, Occupational and Environmental Medicine Residency Advisory Committee, UAB Occupational and Environmental Medicine Residency Program, Birmingham, Alabama, 1991-present.

Coordinator, Occupational Medicine Presentation Series, Division of Occupational and Environmental Medicine, University of Alabama at Birmingham, Birmingham, AL, 1991-1995.

Member, University of Alabama at Birmingham Biosafety committee, 1992-present.

Member, Toxicology Faculty Search Committee, Department of Environmental Health Sciences, University of Alabama at Birmingham School of Public Health, 7-94 to 7-95.

Reviewer, *Archives of Family Medicine*, 4-94 to present.

Reviewer, *American Family Physician*, 7-93 to present.

Member, Ph.D. Dissertation Committee, Renee Harrison, Graduate Student, Department of Epidemiology, UAB School of Public Health. November 1995-Present.

Member, D.S.N. Dissertation Committee, Belinda Downing, Graduate Student, UAB School of Nursing, Fall 1992.

Member, M.S. Thesis Committee, Phyllis Cheatam, Graduate Student, Department of Environmental Health Sciences, UAB School of Public Health.  May 1992-May 1993.

Member, M.S. Thesis Committee, Bonnie Kennamore, Graduate Student, Department of Environmental Health Sciences, UAB School of Public Health.  May 1992-May 1993.

Member, Ph.D. Dissertation Committee, Yaw Adjepong, Graduate Student, Department of Epidemiology, UAB School of Public Health.  May 1992-May 1993.

Member, Planning Committee, Pesticides:  Use and Health Effects, Deep South Center for Occupational Health and Safety, Birmingham, Alabama, 1-93.

## PUBLICATIONS

1.  Forrester. B. G., "Latex Contact Urticaria", *UAB Allergy Newsletter*. Winter, 1991.

2.  Forrester, B. G., Presson, A., Yodaiken R., "An Analysis of Shiftwork as a Causal Factor in OSHA Collected Injury Data". *OEM Report*. December, 1991.

3.  Forrester, B. G., "Rubber Contact Urticaria", In: Nethercott, JR (ed), Occupational Skin Disease *,Occupational Medicine State of the Art Reviews*. 1994;9(1):75-80.

4.  Forrester, B. G., Nethercott, J.R., "Skin Cancers", In: Rosenstock L, Cullen M. (eds), *Textbook of Clinical Occupational and Environmental Medicine* . W. B. Saunders Company, Philadelphia, 1994.

5.  Brooks F, Curtis EC, Forrester BG, Roth V, Spickard J, Webster B. "Review of Research Involving Radioisotopes Conducted by Dr. G.E. Burch at Charity Hospital in New Orleans, Louisiana under the Auspices of Tulane University During the 1940s, 1950s, and 1960s". Prepared by: Occupational Medicine Program, Medical Sciences Division, Oak Ridge Institute for Science and Education., for *Hearings by the Subcommittee on Investigations and Oversight, Committee on Science, U.S. House of Representatives*, Rep. James A. Hayes, Chairman. July 7-8, 1994.

6.  Brown KC, Forrester BG, Phillips JA. "Primary and secondary occupational considerations in the prevention and control of low back pain". *Orthopedic Physical Therapy Clinics of North America*. 1995;4(3):387-401.

7.  Phillips JA, Forrester BG, Brown KC. "Low back pain. Prevention and management" *AAOHN Jrnl*. 1996;44(1):40-51.

8.  Forrester BG, Weaver MT, Brown KC, Phillips JA, Hilyer JC. "Personal health risk predictors of occupational injury among 3415 municipal employees". *Journal of Occupational and Environmental Medicine*. In press.

## PRESENTATIONS/REPORTS

*"Medical aspects of the hyperbaric environment."* ENH 628, Occupational Exposure to Temperature and Pressure Extremes. UAB School of Public Health, Birmingham, AL. October 2, 1995.

*"Medical Surveillance and Record Keeping for the Practitioner".* Occupational Medicine Update. Deep South Center for Occupational Health and Safety. Destin, Florida. September 15, 1995.

*"The effects of shiftwork on health, performance, psychosocial well-being, and occupational illness and injury",* Basic Curriculum in Occupational Medicine, Segment 3, American College of Occupational andd Environmental Medicine, Las Vegas, Nevada, April 30, 1995.

*"Ionizing and Nonionizing Radiation",* Basic Curriculum in Occupational Medicine, Segment 3, American College of Occupational and Environmental Medicine, Las Vegas, Nevada, April 30, 1995.

Lecturer, *Occupational Disease Course* (PHE 520), UAB School of Public Health, Birmingham, AL. Spring 1995.

*"Occupational Medicine: Who are we and what do we do?",* 9th Annual Alabama Occupational Health, Safety, and Environmental Conference, Institute '95. UAB Deep South Center for Occupational Health and Safety, Birmingham, AL, March 15, 1995.

Lecturer, *Industrial Hygiene Course* (IH605), Auburn University, Auburn, AL, Winter, 1995.

*"Chemical sensitivity."* Pulmonary Research Forum, UAB Division of Pulmonary and Critical Care Medicine. Birmingham, AL. November 8, 1994.

*"Managing the dental patient with multiple chemical sensitivities"* UAB Dental School Morning Conference Series, UAB School of Dentistry, Birmingham, AL. October 10, 1994.

*"Health Risk Assessment of Environmental Hazards",* University of Alabama at Birmingham's Department of Family and Community Medicine Noon Lecture Series, Birmingham, AL. September 22, 1994.

## PRESENTATIONS/REPORTS *(Continued)*

*"Risk Assessment: Diagnosing Environmental Illness"* Occupational Medicine Update. Deep South Center for Occupational Health and Safety. Destin, Florida. September 16, 1994.

*"Occupational Medicine: Who are we and what do we do?"*, UAB Department Of Rehabilitation Medicine Grand Rounds, UAB School of Medicine. Birmingham, AL. May 27, 1994.

Lecturer, *Occupational Disease Course* (PHE 520), UAB School of Public Health, Spring 1994.

*"Occupation and Cancer"*. Cancer Epidemiology and Control Seminar Series. UAB Comprehensive Cancer Center. March 16, 1994.

*"Occupational Contact Dermatitis"*. UAB Medical Student Clinical Correlation Conference. UAB School of Medicine. Birmingham, AL. March 15, 1994.

*"Panel on multidisciplinary approaches to Occupational Health"*. Occupational Medicine Update. Deep South Center for Occupational Health and Safety. Destin, Florida. September 17, 1993.

*"Occupational Asthma"*. Pulmonary Research Forum, UAB Division of Pulmonary and Critical Care Medicine. Birmingham, AL June 29, 1993.

"Control and Monitoring Of Chemical and Radiation Hazards in Medical Centers. "Postgraduate Seminar, American Occupational Health Conference, American College of Occupational and Environmental Medicine. Atlanta, Georgia. April 26, 1993.

*"Approach to the Chemically Sensitive Patient. "* Westinghouse Corporate Occupational Medicine Conference. Atlanta, Georgia. April 26, 1993.

Lecturer, *Occupational Disease Course* ( PHE 520), UAB School of Public Health, Spring 1993.

*"Occupational Cancer"* University of Alabama at Birmingham's Department of Family and Community Medicine Noon Lecture Series, Birmingham, AL. April 13, 1993.

7

## PRESENTATIONS/REPORTS *(Continued)*

*"Medical Surveillance"* University of Alabama at Birmingham's Department of Family and
Community Medicine Noon Lecture Series, Birmingham, AL. January 28, 1993.

*"Pesticide-Related Contact Dermatitis. "* UAB Deep South Center for Occupational Health
and Safety Course: Pesticides: Use and Health Effects. Birmingham, AL. January 25,
1993.

*"Ergonomics: What work does to your body."* University of Alabama at Birmingham Center
for Labor Education and Research Course: Ergonomics for Union Representatives,
Birmingham, AL. December 7, 1992.

*The Chemically Sensitive Patient: A Critical Review of the Literature. "* UAB Deep South
Center for Occupational Health and Safety Course: "5th Annual Occupational Medicine
Update". Destin, FL, September 19, 1992.

*"Medical Requirements of the Bloodborne Pathogens Standard"*, UAB Deep South Center
for Occupational Health and Safety Course: "Bloodborne Pathogens--Application of
OSHA Standard", Birmingham, AL. June 22, 1992.

*Occupational Disease Course* (PHE 520), Lecturer, UAB School of Public Health, Spring
1992.

*"Medical Surveillance: Principles and Applications"*, UAB Deep South Center for
Occupational Health and Safety Biological Monitoring Two-Day Short Course,
Birmingham, AL, March 16, 1992.

*"Herpesvirus Simiae Infection in Humans"*, UAB Comparative Medicine/Animal Resources
Personnel Seminar Series, University of Alabama at Birmingham, Birmingham, AL,
March 13, 1992.

*"Obtaining an Occupational History"*, UAB Division of Undergraduate Education, Clerkship
Lecture Series, University of Alabama at Birmingham, Birmingham, AL, January,
1992-present.

## PRESENTATIONS/REPORTS *(Continued)*

*"Anatomy, Physiology and Pathology of the Lung, Skin, Ear and Eye"*. Industrial Hygiene Course (IH605), Auburn University, Auburn, AL, January 23, 1992.

*"Occupational Dust Diseases of the Lung"*. Pulmonology and Critical Care Weekly Conference, University of Alabama at Birmingham, Birmingham, AL, January 23, 1992.

*"Choosing an Occupational Physician"*. United Steelworkers Safety and Health Programs, Center for Labor Education and Research, University of Alabama at Birmingham, Birmingham, AL, December 13, 1991.

*"Epidemiology in Primary Care"*. Family and Community Medicine Noon Lecture Series, Department of Family and Community Medicine, University of Alabama at Birmingham, Birmingham, AL, November 21, 1991.

"An Analysis of Shiftwork as a Causal Factor in OSHA Collected Accident Data". Occupational Safety and Health Administration, Washington, D.C., June 17, 1991.

*"Occupational Contagious Diseases"*. International Association of Fire Fighters, Washington, D.C., June 7, 1991.

*"An Analysis of Arsenic and Vanadium Exposure in Oil and Coal-Fired Boiler Maintenance Workers"*. Baltimore Gas and Electric Company, Baltimore, MD., [Senior Research Project, May 13, 1991].

*"Establishing an Occupational Health Department for Fire Departments"*, International Association of Fire Fighters Regional Education Conference, San Francisco, CA, May 15-17, 1991.

## CONSULTING ACTIVITIES

City of Birmingham, Occupational Medicine Consultant, Birmingham, AL, 2/95 to present.

Department of Energy, Reviewer of Contract Occupational Medicine Programs, Oak Ridge
Institute for Science and Education. Oak Ridge, Tennessee, 1992 - present.

Rust Engineering, Occupational Medicine Consultant, Birmingham, Alabama, 1992 - present.

Kimberly Clark Corporation, Occupational Medicine Consultant to the Coosa Pines Plant.
Childersberg, Alabama, 1992 - present.

## PROFESSIONAL MEMBERSHIPS

American College of Occupational and Environmental Medicine
American Public Health Association
American College of Preventive Medicine
Society for Occupational and Environmental Health

## MILITARY SERVICE

U. S. Navy     Honorable Discharge, June 1989

Undersea Medical Officer, Naval Submarine Base, Kings Bay, GA, 7/86 - 6/89

Undersea Medical Officer Candidate, Naval Undersea Medicine
Institute,Groton, CT, 11/85 - 6/86

General Medical Officer, Marine Corps Recruit Depot, San Diego, CA, 7/85 -
11/85

Promotions:   Lieutenant Commander, April 1989
Lieutenant, May 1984
Ensign, Naval Reserves, 1980-1984