IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

FILED
01 MAR -1  PM 3: 38
U.S. DISTRICT COURT
N.D. OF ALABAMA

WALTER OWENS, et al.,

    PLAINTIFFS,

v.                                             CASE NO.: CV-96-J-440-E

MONSANTO COMPANY,

    DEFENDANT.

ENTERED
MAR 1 2001

### MEMORANDUM OPINION

The defendant's pending motions for summary judgment (docs. 70-75) were heard in open court and on the record on February 15, 2001. The parties were present by and through their respective counsel. The court having considered the respective submissions of the parties, the briefs in support of and in opposition to said motions and the arguments made in open court, finds that the motions for summary judgment are actually motions for judgments on the pleadings. The court further finds that the pleadings, as found in the January 16, 1998 amended complaint (doc. 52), are sufficient to survive all said motions except for defendant's motion for judgment on the pleadings as to "Environmental Justice" claims (doc. 73) specifically addressing Count VII (Title VI of the Civil Rights Act of 1964) and Count VIII (Title VIII of the

Fair Housing Act of 1968) of the plaintiff's amended complaint.[1] Thus, defendant's motions shall be **GRANTED** in part and **DENIED** in part as set forth below.

### Motions for "fear of cancer" or "fear of future injury" (doc. 71); medical monitoring (doc. 70); and "stigma damages" (doc. 72):

The court notes that the claims of the plaintiffs in this case are based on theories of toxic tort, for which this court finds little guidance by way of previous rulings from either the Supreme Court of Alabama or the Eleventh Circuit Court of Appeals.[2] The court finds from a review of the pleadings that the plaintiffs have no claim or cause of action stated in their January 16, 1998 amended complaint for "stigma damages" as claimed by defendants (doc. 72). Similarly, this court finds that the plaintiffs have not stated any claims for "fear of cancer" or "fear of future injury" (doc. 71). Additionally, the plaintiffs have not brought a claim for medical monitoring (doc. 70). The court notes that while plaintiffs may claim damages for these items, they have not brought the subjects of these motions as claims in their amended complaint.[3] As such, the court finds the defendant's motions, whether called motions for summary

---

[1] Under Rule 12(c), if, in considering a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. Rule 12(c), Fed.R.Civ.P.

[2] The court finds persuasive case law from other Courts of Appeal and state supreme courts does exist.

[3] In the January 16, 1998 amended complaint, the plaintiffs' request for relief is for an injunction, money damages for property damage, physical pain, mental anguish and wrongful death, punitive damages as applicable, and any other damages or remedies appropriate under law. Amended complaint at 7.

judgment or motions for judgments on the pleadings, are not well-taken on these issues.

At the hearing on these motions on February 15, 2001, defendant's counsel stated to the court that the defendant believed, as a matter of law, some of the plaintiff's claims were not cognizable under Alabama law. Hearing record ("H.R.") at 6. Plaintiffs' counsel conceded that, if the court found no set of facts which could support a particular claim, the court could go ahead and rule on an appropriate motion. H.R. at 7-8. Counsel for plaintiffs argued that the defendant's motions were fact specific to each of the individual plaintiff's claims, however, they all believed they would benefit from having a notion on how the judge would rule on certain issues. H.R. at 8.

The court does find that at least one of the defendant's motions (fear of cancer motion (doc. 71)) can be correlated to the plaintiffs' report on identification, description and selection of plaintiffs for phase one trial[4] (doc. 68). The plaintiffs state in that document:

> although there appeared to be excessive incidence (sic) of certain diseases which had been associated with PCB and/or other chemical exposure in the community, we do not intend to try to prove, at least for most of the plaintiffs, that a specific plaintiff had a specific disease as a

---

[4]In that document, which is not a pleading, the plaintiffs state: "the purpose of trying individual claims is to gather some useful information about how a jury would respond to certain kinds of claims so that the parties are in a better position to discuss a global settlement." *See* doc. 68 at 2.

3

> result of PCB and/or other chemical exposure. Rather, the base level claim which will be asserted on behalf of all of the plaintiffs is one for mental distress, fear and emotional upset as a result of being placed at substantially increased risk of catastrophic latent disease or illness as a result of exposure to PCB's and/or other chemicals. The base level claims also will include special damage claims for future medical expenses (medical monitoring). The fact that the major focus of plaintiffs' claims will be emotional injury does not mean that there is no past or present existing physical injury. To the contrary, the base level claim includes a claim for subclinical physical injury.

Doc. 68 at 3.

At the hearing, the defendant represented to the court that "a very small fraction of those plaintiffs are alleging that they have a manifest physical injury or disease as a result of their exposure to PCBs. H.R. at 9. The court finds from the plaintiffs' identification statement that the plaintiffs may or may not be planning on bringing "fear of" claims at trial.[5] However, the court finds such claims absent physical injury

---

[5]The court understands the May 13, 1996 amended complaint which had a count for negligent infliction of emotional distress to be replaced by January 16, 1998 amended complaint, which does not have such a claim in it. Clearly, a cause of action for negligent infliction of emotional distress does not exist under Alabama law. *See Alabama Power Company v. Murray*, 751 So. 2d 494, 498 (Ala.1999) (Although *Taylor* held, and *Flagstar [Enterprises, Inc. v. Davis*, 709 So.2d 1132 (Ala.1997),] recognized, that a physical injury is no longer a prerequisite to the recovery of damages for emotional distress in a negligence action, neither of those decisions was intended to establish a new and independent tort action for negligently inflicted emotional distress. Since *Taylor,* this Court has stated repeatedly that such an independent tort does not exist in Alabama.... [T]his Court has adhered to the principle that negligently causing emotional distress is not an independent tort in Alabama, but, rather, that it is part and parcel of the traditional tort of negligence..."(citations omitted)). At any rate, the plaintiffs seemed to be representing at the February 15, 2001 hearing that the nine plaintiffs to be tried in the Phase I trial did each have some type of actual, identifiable, injury. H.R. at 27-28.

have not been plead by the plaintiffs.[6] Furthermore, the court notes the plaintiffs' expert's testimony on the meaning of "subclinical" is open to more than one interpretation. H.R. at 10-12.

Thus, the court is left with motions for judgments on the pleadings for claims that have not been plead, which is highly unusual in this court's experience. This court has confined its rulings on motions for judgments on the pleadings in past cases to determinations of whether the complaint of the plaintiff and answer of the defendant create triable issues. The court is inclined to continue to so limit itself.[7] Thus, while the parties may be looking for guidance, this court will not begin now making rulings on motions that are "not really" designed to be dispositive motions

---

[6]The court does note that the plaintiffs are attempting to have their proverbial cake and eat it too, wanting to provide evidence and testimony on their "base level claims" although pleading in their amended complaint causes of action which do not give rise to such claims. The court notes the amended complaint has claims for trespass, nuisance, outrage, negligence, intentional and/or wanton conduct, strict liability and Titles VI and VIII. The court is not quite sure how the plaintiffs' "base level claims" comport to these pleadings, other than as a means to avoid pleading, but present evidence on, questionable causes of action. Clearly, several of the claims presented in the amended complaint, if proven at trial, would lend themselves to damages for emotional distress and other emotional-type injuries. *See* H.R. at 29.

[7]The court finds even stranger the plaintiffs' repeated contentions that the defendant's motions are "not really motions for summary judgment or motions for judgment on the pleadings. Thus, although the motions are designated motions for summary judgment, for the most part they do not contain any supporting evidentiary material. Instead, they make assumptions about probable evidence in the case ... Rather, the function served by the motions is to highlight certain fundamental legal issues, the resolution of which might have some impact on the further preparation of the case for trial..." Plaintiffs' brief in opposition to defendant's dispositive motions, September 22, 1999, at 1-2. At the February 15, 2001 hearing, the plaintiff again represented that the purpose of the defendant's motions were for "guidance about what [the judge] will ultimately let go to the jury." H.R. at 26.

5

based on assumptions about disputed evidence that may be presented at trial. The court finds that denying such motions with leave for defendant to refile them at such time as the court hears the evidence to be presented in support of the plaintiffs' case would be in the interest of justice, especially given the dubious nature of these motions for summary judgment.

The court also finds that the parties have chosen to proceed to trial with claims sanctioned by the judge to whom this case was formerly assigned and insist on going forward in that manner despite this court having expressed its sincere misgivings about the advisability of this procedure.

This court declines to give the parties any advisory opinions on what claims may be presented and what claims may not be presented at trial. Rather, this court shall rule on appropriate motions on these issues at appropriate times during the litigation, such as "real" motions for summary judgment or at trial after the plaintiffs have rested their case.

### Motion for summary judgment based on the statute of limitations and strict liability (docs. 74 and 75):

The court finds that the defendant agreed at the February 15, 2001 hearing on these motions that the motion for summary judgment based on arguments concerning the statute of limitations could be better addressed as the case progresses, based on the testimony of the parties which this court has yet to hear. H.R. at 50-51.

As to the defendant's motion for summary judgment regarding the plaintiffs' strict liability claim, the court at this time is inclined to consider this as a question of fact, for the jury. *See Peters v. Amoco Oil Co.*, 57 F.Supp.2d 1268, 1285-1286 (M.D.Ala.1999).

### Motion for judgment on the pleadings as to "environmental justice" claims (doc. 73):

The court finds that the defendant Monsanto's motion for judgment on the pleadings as to "environmental justice" claims (doc. 73) is the only one of the pending motions on which the court can rule at this time, as it actually correlates to Counts VII and VIII in the January 16, 1998 amended complaint. Count VII alleges that the defendant has illegally discriminated against the plaintiffs by deliberately operating its facility in a neighborhood where a majority of the residents are African-American. *See* amended complaint at 5, Count VII (alleged violation of Title VI of the Civil Rights Act).

Title VI prohibits discrimination "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In their amended complaint, plaintiffs allege that Monsanto is a recipient of federal funds, but fail to plead facts to support this assertion. In the hearing held on February 15, 2001, the plaintiffs made further argument as to why they were within the class protected by this statute, but did not make any showing that the defendant received federal funds. H.R. at 59-61.

Similarly, in their brief in opposition to defendant's dispositive motions, the plaintiffs make compelling arguments as to their standing to bring suit under Title VI, but fail to address or reference what federal funding the defendant is alleged to have received (if any) and fail to offer any evidence of such funding within the parameters of Title VI, as set forth below.[8]  Plaintiffs' brief at 35-42.

The statutory provisions at issue here were enacted by Congress in response to the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), by passage of the Civil Rights Restoration Act of 1987, Pub.L. No. 100-259, 102 Stat. 28 (1988).[9]

In *Grove City*, the Court, narrowly construing the breadth of the Civil Rights statutes' coverage, held that Title IX applied not to an entire institution, but only to

---

[8] The plaintiffs merely state that they "upon information and belief, would show this court that the defendant, who received federal financial assistance ..." Plaintiffs' brief at 42.

[9] Congress premised the Restoration Act upon its findings that (1) "certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of Title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title VI of the Civil Rights Act of 1964; and (2) legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered." Restoration Act § 2, 102 Stat. at 28. The Senate report more bluntly states that the purpose of the Restoration Act is "to overturn the Supreme Court's 1984 decision in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211...." S.Rep. No. 64, 100th Cong., 2d Sess. 1, *reprinted in* 1988 U.S.Code Cong. & Admin.News 3-4.  *See DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 911 F.2d 1377, 1384 (10th Cir.1990)

the specific program or activity that benefits from federal financial assistance.[10] 465 U.S. 570-74, 104 S.Ct. 1211. In response, Congress passed 42 U.S.C. 2000d-4a, which greatly broadened the reach of the Civil Rights statutes to cover entire entities regardless of whether the federal assistance was directed to the institution as a whole or to a discrete program administered by the entity:

> For the purposes of this subchapter, the term "program or activity" and the term "program" means all of the operations of–
> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
> (2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or
> (B) a local education agency... a system of vocation education, or other school system;
> (3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship–
> > (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or
> > (ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or
> (B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

---

[10] Although the *Grove City* opinion discussed this issue in the context of Title IX, it recognized that "Title IX was patterned after Title VI and contains nearly identical language." 465 U.S. at 566. *See e.g. Mabry v. State Board of Community Colleges and Occupational Ed.*, 813 F.2d 311, 317 (10th Cir.); *cert.denied* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987).

> (4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);
> any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d-4a. The statute covers four types of institutions: state and local government agencies, educational institutions, private corporations, and entities established by two or more of the above. The statute defines a program or activity as "all of the operations" of the covered entity, "any part of which is extended Federal financial assistance." The first, second and fourth types of entities are not limited by either how they receive such federal assistance, or what kind of services they provide. Section three, however, applying to private corporations, is more limited than the other categories. Only private corporations which fit into one of three "inclusions" are covered by Title VI. *See* §§ 2000d-4a(3)(A)(i), (3)(A)(ii), (3)(B).

In order to proceed on their Title VI claims, Plaintiffs must plead facts in support of one of the following: (1) Monsanto was extended federal financial assistance as a whole; (2) Monsanto is principally engaged in the business of providing education, healthcare, housing, social services, or parks and recreation; or (3) the Anniston facility directly received such assistance. Plaintiffs argue that Congress so broadened the scope of the definition of a federally funded "program or activity," that "as long as any part of any defendant's operations receives federal

financial assistance, all of that defendant's operations are subject to Title VI."[11] Plaintiffs allege that "the mere receipt by defendant of federal funds by loan, contract, subsidy, stipend, grant (including research grants), lease (including oil, gas, or mineral leases), or otherwise renders their operations subject to Title VI." Plaintiffs' brief at 41. This is just not the case.

The statutory limitations indicate that, regardless of the broad language contained in the rest of the amendment, Congress did not intend Title VI to have such a sweeping effect as to create a private right of action against any private corporation that receives some sort of federal monies. Accordingly, plaintiffs have not alleged facts sufficient to support a finding that the defendant's operations in Anniston constitute a "program or activity" as defined by § 2000d-4a, and, as such, this claim is due to be dismissed as a matter of law.

Plaintiffs have also brought a claim under Title VIII of the Fair Housing Act of 1968 ("FHA"). Although in their amended complaint plaintiffs refer to the FHA in general, in their brief they rely on 42 U.S.C. § 3617, which prohibits "interfere[nce] with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605,

---

[11]Plaintiffs fail to allege what types of federal assistance Monsanto received or whether the Anniston facility in particular received any such assistance.

11

or 3606 of this title." 42 U.S.C. § 3617. Section 3617 therefore only prohibits interference with the exercise and enjoyment of rights protected by § 3603-3606, of which, only provision § 3604(b) is arguably applicable here. Section 3604(b) reads:

> it shall be unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(b). As the defendant points out, nothing in the text of the statute addresses the type of conduct alleged by plaintiffs – that defendant disposed of hazardous waste in a discriminatory fashion.

Title VIII was intended to remedy discrimination in the sale and rental of housing and the provision of neighborhood services. The court finds unlikely that its drafters contemplated it as redressing such unrelated harms as toxic waste pollution in minority neighborhoods. Courts that have examined the scope of Title VIII outside of its stated context have rejected an extremely broad application of the statute. Title VIII, and in particular, 42 U.S.C. § 3604(b), just "does not extend to every activity having any conceivable effect on neighborhood residents." *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 193 (4th Cir. 1999). The Fair Housing Act's services provision simply requires that "such things as garbage collection and other services of the kind usually provided by municipalities" not be

12

denied on a discriminatory basis[12]. *Id*, citing *Mackey v. Nationwide Insurance Co.*, 724 F.2d 419, 424 (4th Cir. 1984).

As a matter of law, plaintiffs cannot maintain a FHA claim on the basis of their stated allegations, and these claims are due to be dismissed.

## Conclusion

The court having considered the foregoing and the court being of the opinion that the plaintiffs' environmental justice claims (doc. 73) are due to be dismissed;

It is therefore **ORDERED** by the court that the defendant's motion for judgment on the pleadings on this issue (doc. 73) be and hereby is **GRANTED**. Judgment is therefore rendered in favor of the defendant and against the plaintiff on Counts VII and VIII of the plaintiffs' January 16, 1998 amended complaint.

The court finding that the remainder of the defendant's motions (docs. 70, 71, 72, 74, and 75) are due to be denied:

---

[12]In *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 193 (4th Cir.1984), the court noted that:
"To say that every discriminatory municipal policy is prohibited by the Fair Housing Act would be to expand that Act to a civil rights statute of general applicability rather than one dealing with the specific problems of fair housing opportunities." *Clifton Terrace Assocs.*, 929 F.2d at 720 (quoting *Vercher v. Harrisburg Housing Auth.*, 454 F.Supp. 423, 424 (M.D.Pa. 1978)). In selecting a site for the Route 50 Bypass around the City of Salisbury, defendants did not become providers of housing services within the meaning of section 3604(b).

It is therefore **ORDERED** by the court that these motions be and hereby are **DENIED**, or whatever the appropriate term may be ascribed to these motions as any ruling on the merits of such motions would be purely advisory, and based on speculative evidence which may be presented at some point in this litigation in the future, which this court notes is dangerously close to the prohibition against advisory opinions stemming from Article III of the United States Constitution.

**DONE** and **ORDERED** this the ___1___ day of <u>March</u>, 2001.

_____
UNITED STATES DISTRICT JUDGE
INGE P. JOHNSON